**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM MONROE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 25-cv-00575 |
| | ) | |
| v. | ) | |
| | ) | |
| SAINT LOUIS PUBLIC SCHOOL DISTRICT | ) | |
| and THE BOARD OF EDUCATION OF THE | ) | |
| CITY OF SAINT LOUIS, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

1.  William Monroe is an advocate for improving the quality of education in St. Louis Public Schools. He is a former member of the Board of Education of the City of St. Louis and was a candidate in the Board election held April 8, 2025.

2.  Mr. Monroe frequently attends meetings of the Board of Education and other District events. During the public comment period of Board meetings, he has been a passionate and vocal critic of the St. Louis Public School District's leadership. His public critiques are part of his broader ongoing advocacy efforts.

3.  As a result of his harsh criticism, Mr. Monroe was threatened with bans from public Board meetings and eventually banned from attending events on District property, including Board meetings, for six months.

4.  Mr. Monroe brings this lawsuit to seek redress for the violations of his First and Fourteenth Amendment rights caused by the unconstitutional ban, to seek redress for violations of his First Amendment rights caused by the District and Board's unconstitutional public comment rules, and to seek injunctive relief to prohibit enforcement of those rules.

## JURISDICTION AND VENUE

5.  This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of rights secured by the First and Fourteenth Amendments to the United States Constitution.

6.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

7.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all relevant events giving rise to the claims occurred within the City of St. Louis, Missouri.

8.  Divisional venue is proper in this Court because the events serving as the basis for Mr. Monroe's claims for relief arose in the City of St. Louis, Missouri.

## THE PARTIES

9.  Plaintiff William Monroe is a resident of the City of St. Louis.

10. Mr. Monroe is a veteran, a former law enforcement officer, and an advocate for improving the quality of education for students in the City of St. Louis. For over 20 years, Mr. Monroe has regularly attended meetings of the St. Louis Public School Board.

11. Defendant St. Louis Public School District (the "District") is a Missouri school district that operates public schools within St. Louis, Missouri. The District is a public school system organized and maintained under the laws of the State of Missouri.

12. Defendant Board of Education of the City of St. Louis (the "Board") is the governing body of the District.

13. At all relevant times, the District and Board as well as their agents, employees, officers, and representatives have acted under color of state law in enforcing the ban against Mr. Monroe and policies of the Board.

<u>**FACTS**</u>

**Policies of the Board of Education**

14. The Board of Education has authority to adopt policies and bylaws pursuant to Missouri law. *See* Board of Education Bylaw No. B9310. The Board may also approve regulations prepared by the superintendent or appropriate administrators. *Id.*

15. Board of Education Bylaw No. B9100 states that the Board of Education shall have "general and supervisory control, government, and management of the public schools and public school property of the district in the city and shall exercise generally all powers in the administration of the public school system therein." This includes the power to make policies for the "government, regulation, and management of . . . school property."

16. Board of Education Policy No. P1160 requires the Board to "attempt to take into account the viewpoints of all segments of the community," engage in "positive leadership and communication skills" at Board meetings, and ensure that the community receives unbiased information about contentious issues that involve the Board.

17. Board of Education Policy No. P1100 encourages community involvement and "participat[ion] in the decision-making process by commenting on matters of concern to appropriate school officials" and "making presentations to the board."

18. According to Board of Education Bylaw No. B9355, all Board meetings at which "public business is discussed, decided, or public policy [is] formulated" are open to the public unless an authorized exception exists under state law. The bylaw defines "public business" to include "all matters which relate in any way to the performance of the board's function or the conduct of its business."

19. The Board of Education holds these public meetings every second Tuesday of each month at 6:30pm.

20. Board of Education Policy No. P1120 states that Board meetings provide a platform for "any citizen to express his or her interest in and concerns for the schools." The policy further states that the public is invited to attend "any and all sessions of the board and raise issues of concern before the meeting begins."

21. According to Board of Education Bylaw No. B9358.3, the Board recognizes the "value of participation by the public in deliberations and decisions on school district matters." The purpose of allowing public participation is to grant community members the "opportunity to express all [their] respective views." The Board encourages public participation at school board meetings on "subjects related to the school district's management."

22. According to Board of Education Bylaw No. B9358.3, during public meetings, the Board will designate a specified period when "citizens may address the school board on any topic, subject to the limitations of the policy."

23. Board of Education Bylaw No. B9358.3 states that individuals who wish to address the Board "must sign in and provide their name, address, phone number, or email address and the subject of their comment." Additionally, "[o]nly those speakers recognized by the chair will be allowed to speak." *Id*.

24. However, Board of Education Bylaw No. B9358.3 prohibits speakers from "identifying school employees and/or students by name, title, and/or location" during the public comment period of Board meetings.

25. Board of Education agendas also state rules for public comments at Board meetings. The agenda states: "Each commenter must remain respectful and **refrain from speaking derogatorily about anyone** (do not use names)" (emphasis in original).

26. Either the Board president or a District employee announces the rules for public comments verbally while opening the public comment sections. Commenters are informed they should "not use names."

27. Board of Education Bylaw No. B9358.3 further prohibits "[p]ersonal attacks by anyone addressing the school board" and states that "[p]ersistence in such remarks" will result in the termination of the speaker's "privilege to address the school board." The bylaw does not define "personal attacks."

28. Board of Education Bylaw No. B9200 states that the duties of the Board president include presiding over all Board meetings, "enforc[ing] rules," and signing all letters ordered to be executed by the Board.

**Mr. Monroe's Engagement with St. Louis Public School District**

29. For over two decades, Mr. Monroe has engaged in activism relating to the operations of St. Louis Public Schools. He ran as a candidate in the April 8, 2025 School Board election. He was previously a member of the Board from 2013 to 2017. He has sought collaboration with the Board to establish a technical career-based school that would support youth at risk in St. Louis.

30. Mr. Monroe has long been a regular attendee at Board meetings and engaged in criticism of the District's operations during public comment periods at those meetings.

31. On March 12, 2024, Mr. Monroe attended and participated in public comment at a Board meeting of the St. Louis Public Schools.

32. Before public comments, Ryonnel Jackson, a District employee, read guidelines for public comments, declaring, "Each commentor must remain respectful and refrain from speaking derogatorily about anyone. Please do not use names."

33. Mr. Monroe's comments at this meeting included criticism regarding the Board and District for what Mr. Monroe views as their failure to include Black men in managing St. Louis Public Schools and fighting racism.

34. In his comments, Mr. Monroe named then-Board President Antionette "Toni" Cousins, then-Vice President Matt Davis, current Board member Tracy Hykes, and then-superintendent Dr. Keisha Scarlett.

35. Mr. Monroe's comments were as follows:

> I don't know why that you have on this sheet, for us to ask you for a response. The St. Louis School Board makes no response to the community. The St. Louis School Board is not connected to community. And, Mr. Hykes, you mentioned charter schools—I'm Bill Monroe, I'm the founder of the first Black charter school in this town, Thurgood Marshall, and I know the history of charter schools, and I know the history of how white America treats Black men who participate in such proactive schools.

> We look at what's going on with the the, the, the schools that don't want Black programs. I'm trying to think of the name of the school, they don't want a Black program on it. And I see no difference than right here in this—right here before this St. Louis Public School Board, and the only thing that's going to help this community is two things—Black men are going to have to run for office on the St. Louis Public Schools. Black men. Real Black men, who are not afraid. Who are not afraid to anger their white master. The same ones that are participating in these, in these schools where they deny Black, Black, scholastics, they don't want it. Francis Howell.

> The first, the first time I saw a school district do away with a Black man was out there when they, what—what is the brother's name? Geez I can't think of it, but there is a opposition to Black men being on school boards. An opposition. And we have a white male attorney in charge of the St. Louis public schools—a 90% Black district. Black people are the only ones in history that allow white people to mismanage their children's education, and that's what we're confronted with.

> I'm announcing once again, Bill Monroe is running for a seat on the St. Louis school board. There needs to be Black men unafraid, unafraid to confront the racism—the white racism that we have to confront even in the St. Louis public schools. Bill Monroe, as the founder of the first Black charter school was not

allowed a seat at the city-wide planning, per Ms. Cousins and Mr. Matt Davis who said they weren't going to allow it.

Okay. There has to be—there has to be a reach out to the community. I doubt very seriously if Dr. Scarlett will last a year in this racially involved climate that we exist in. I doubt very seriously that she has the courage to fight white racism as we see it. Bill Monroe and other Black men are going to run for this school board and I hope some of them are in this building right now. There needs to be Black men running for school—are there any, any here that are considering running for the school board? Anybody?

You consider it? Do it. Do it. And, and the information that I gave this Board about these vacant buildings that are crumbling in our community, involving dangerous things that are happening in our community, they won't even talk to me. I submitted paperwork to this school district, they won't even respond to me, as if they don't have to respond to Black men. Well, let's make it so. If we don't take them to court let's go to the ballot box. Thank you.

36. Immediately following Mr. Monroe's remarks, Mr. Jackson reiterated the Board's policy to not use names.

37. Following the meeting, the Board's outside counsel, acting on behalf of the Board, sent Mr. Monroe a letter dated March 18, 2024.

38. The letter claimed that Mr. Monroe's conduct at the Board meeting on March 12, 2024, "created an unacceptable disruption to the Board's ability to effectively gather public feedback, including but not limited to, [his] violations of the rules communicated at the beginning of the public comment period."

39. This letter asserted that it was notice that if Mr. Monroe "engage[s] in any further misconduct at any future Board meeting, the Board of Education will enforce its rights to protect the civility of the meeting, which may include barring your in-person attendance at Board meetings for a period of no less than thirty (30) days."

40. On October 8, 2024, Mr. Monroe attended a Board of Education meeting to speak during public comments.

41. Prior to public comments, Mr. Jackson read the rules for public comments, noting that each commenter "must remain respectful and refrain from speaking derogatorily about anyone."

42. Mr. Jackson also stated that commenters may "not use names or we will cut your mic off and end your comment early."

43. Mr. Monroe stepped up to speak into the microphone after distributing materials for the Board members to view.

44. Mr. Monroe's comments before he was interrupted were as follows:

> Good evening. My name is Bill Monroe, and I would be remiss if I didn't applaud the Colonel, and I don't know why he's no longer here, but he did a good job. And that's the Colonel of security, he's a good guy, and I don't know why he's not here, but he did a good job here. I just passed out some flyers, some brochures, to each one of you, and I'm glad you began to mention the schools that are crumbling in the Black community, we have schools, vacant schools, vacant buildings that are crumbling and dangerous in our community and have been ignored. And I'm glad this came up. And once again—I'll say again—I'm Bill Monroe, and I'm running for the school board.
>
> There's an election coming up, and there needs to be a Black man on this board, unafraid to be Black, and speak up for our community. Our community is with—with the crime, and the homeless kids out here, our children need a place to stay. We got vacant buildings in our community and I gave you a copy of, there's a picture of Stowe and Langston Middle, and I represent Harriet Tubman Career Center, High School and Career Center, and we have a plan, and a bank that's reaching out, where we can take two buildings and we can take these buildings, and make them into dormitories for our homeless children. We've got crime in the streets, we've got the National Guard and the FBI, and everybody targeting on these Black boys, and Black children out here, wanting to lock them up and put them away.
>
> We can take these buildings and within six months with the plan that I have we can take these buildings and make them habitable for our children. One of these vacant buildings by design would be for our young ladies and the other one would be for our young men, we can't put them in the same building—because these are going to be homeless shelters slash dormitories slash educational systems with skills and trades designed for these young people in these homeless situati—I don't know

what you call it, I heard someone use another name for homeless, unhoused or transient or wh—they are homeless. They're living from couch to couch or in alleys or in vacant houses. We got the solution right here, and if we don't do something for our children, if we don't do something for them they're going to perish. Once again, I'm Bill Mon—

45. As Mr. Monroe was finishing his comments and gesturing with his papers, Mr. Jackson approached Mr. Monroe.

46. Approximately three minutes and three seconds after Mr. Monroe began his remarks, Mr. Jackson reached across Mr. Monroe to take and turn off the microphone.

47. Gesturing during his comments and startled by Mr. Jackson's sudden movement, Mr. Monroe moved his arm, and it appears the papers he was holding in his hand made contact with Mr. Jackson's arm.

48. Mr. Monroe then finished his comments while the microphone was being taken, returned to his seat, and remained at the meeting.

49. No one from the District spoke to Mr. Monroe at the meeting on October 8, 2024, regarding his comments, after his comments concluded.

50. On October 22, 2024, a District security officer prevented Mr. Monroe from entering an open session Board of Education work meeting and gave him a letter written by the Board's outside counsel, acting on behalf of the Board and District. The letter had the subject line "No Trespass Order Through April 22, 2025." The letter banned Mr. Monroe from all District property and events for six months, including any meetings held by the District or its Board.

51. The letter erroneously stated that the Board had issued "multiple written warnings" to Mr. Monroe regarding his alleged "disruptive behavior at Board meetings" and alleged "persistent refusal to abide by the Board's established public comment rules."

52. The letter stated that at the October 8, 2024 meeting, Mr. Monroe "again insisted on speaking beyond [his] allotted time."

53. The letter referenced Mr. Monroe's attendance at the October 8, 2024 meeting and mischaracterized his conduct at the meeting as resisting and striking Mr. Jackson's arm.

54. The letter further stated the District would "strictly enforce this order in cooperation with the Metropolitan St. Louis Police Department."

55. The letter did not provide Mr. Monroe with any opportunity to appeal or challenge the no trespass order. Nor did the letter provide Mr. Monroe with any alternative means of engaging in public comment at Board meetings.

56. The Board continued to enforce this ban to exclude Mr. Monroe from all Board meetings and all District property, with two limited exceptions for events that were organized by third parties but held on district property. On February 26, 2025, following a request by Mr. Monroe's counsel, Mr. Monroe was permitted to enter district property to participate in an event for candidates in the upcoming Board of Education election to which he had been invited by the event's third-party organizer. On March 27, 2025, Mr. Monroe was permitted to enter district property to attend another candidate event to which he had been invited after the third-party organizer of that event obtained the district's permission for Mr. Monroe to attend.

57. The order has prevented Mr. Monroe from attending and participating in public comment at Board meetings, as he would have done but for the order, and limited his ability to engage with Board members on issues of importance to him.

**The Board's Discriminatory Enforcement of the "No Names" Policy**

58. Although Board policy prohibits the use of all names, in practice the Board discriminates in its enforcement of the name policy by enforcing the policy when names are used in comments

critical of the Board or District, but not enforcing the policy when names are used in positive or neutral comments.

59. The Board has repeatedly enforced the "no names" policy against critics and speech that is critical of the Board or District, while letting other uses of names pass by unchallenged.

60. On October 10, 2023, Mr. Monroe attended Board's regular monthly meeting. At prior meetings, the Board's regular practice was to permit individuals who had signed up for public comment to speak in the order in which they had signed up.

61. Instead of picking speakers in the order they had signed up, Ms. Cousins selectively chose ten speakers from the signup list, many of whom were particularly complimentary of the Board. Ms. Cousins's chosen group excluded Mr. Monroe, who had signed up to speak first, and Mr. Chester Asher, another regular critic of the Board, who was among the first to sign up to speak.

62. Ms. Cousins informed attendees that speakers were prohibited from "speaking derogator[ily] about anyone" and from using names.

63. Three speakers complimented then-superintendent Dr. Keisha Scarlett using her name. One speaker stated she "respect[s] this democratically elected school Board of their choice of Dr. Scarlett to lead this District." Another speaker stated, "We have a new dynamic young Black female leader [in] Dr. Scarlett." A third speaker stated, "We support you Dr. Scarlett. We support you Madam President and Vice President, and we support St. Louis." None of these speakers were admonished or punished for violating the stated prohibition on using names.

64. At the December 12, 2023 Board meeting, Mr. Monroe made passionate comments critical of the Board's policies and lack of meaningful response to the public. Mr. Monroe said the name of the then-superintendent Dr. Scarlett to express his disappointment in a presentation she had given. He later mentioned the name of then-Board President Cousins in reference to something

she had said at a previous meeting. Ms. Cousins immediately interrupted his comments to tell him he could not use names.

65. However, later at the same meeting, an alumnus representing the Vashon Unified Alumni mentioned Dr. Scarlett's name in his greeting to the Board and mentioned that the group "would like to meet with President Cousins, Vice President Davis, or any Board member" assigned to the issues related to the school. He was not stopped, reprimanded, or reminded not to use names.

66. At the March 12, 2024 Board meeting, Mr. Monroe was the first to speak during the public comment section of the meeting. Mr. Monroe mentioned multiple names, including then-superintendent Dr. Keisha Scarlett, and Board members Antionette "Toni" Cousins, Matt Davis, and Tracy Hykes. Immediately after the conclusion of Mr. Monroe's comments, Mr. Jackson reiterated the "no names" policy. The March 18, 2024 warning letter to Mr. Monroe cited his "violations of the rules communicated at the beginning of the public comment period" during the March 12, 2024 Board meeting as a basis for potential future action against him.

67. However, later during the same public comment period, Steven Lawler, who described himself as the former principal of Metro High School, a St. Louis Public School, read out the names and accomplishments of multiple Metro High students who would have been valedictorian absent a policy change. No one reminded Mr. Lawler not to use names.

68. In the public comment period of the April 9, 2024 Board meeting, speakers mentioned Ms. Cousins's and Dr. Scarlett's names in both positive and neutral manners without mention or punishment by the Board.

69. In the public comment period of the May 14, 2024 Board meeting, one speaker said the name of an interim principal five times, referring to the principal in positive terms as she voiced her support for retaining the principal. Another speaker mentioned the name of Board member and

Secretary Donna Jones in a positive light, voicing her agreement with Ms. Jones' concern about the distance of school bus stops from student homes. Neither speaker was reprimanded, interrupted, or reminded not to use names.

70. In the public comment period of the August 13, 2024 Board meeting, Mr. Monroe praised Board member Emily Hubbard by name. Unlike instances in which Mr. Monroe was warned for using names during comments that were critical, Mr. Monroe's mention of Ms. Hubbard's name was not addressed or punished by the Board.

71. In the public comment period of the September 10, 2024 Board Meeting, Mr. Monroe began his comments by sharing his opinion that the Board's "President" and "Vice President" should step down for mismanagement and lack of transparency. He then stated he was "happy" that Board Member Emily Hubbard, who had the prior month called for Ms. Cousins' and Mr. Davis' resignations, "had the guts ... to speak up about this board." Mr. Monroe's mic was then cut off.

72. In the public comment period of the November 12, 2024 Board meeting—the first meeting after the meeting for which Mr. Monroe was banned from Board meetings and District property— a speaker praised Ms. Cousins by name and said it was "very good to see a person with [Ms. Cousins's] knowledge, care, and concern come out to our community." This mention of Ms. Cousins's name was not addressed or punished by the Board.

73. In the public comment period of the January 14, 2025 Board meeting, Chester Asher expressed his frustration with the Board's handling of a scandal involving the former superintendent, Dr. Scarlett.

74. Mr. Asher stated that, while he himself was not a "fan" of the former superintendent, the Board fired the superintendent "and act as if the thing she did was crazy and she created this budget

deficit" but that they "fired her for the same things that Toni Cousins does, a- and by what she does, uh, all those flight upgrades ... ."

75. As soon as Mr. Asher said Ms. Cousins's name, Mr. Jackson came forward and muted Mr. Asher's microphone. Mr. Asher had approximately 12 seconds remaining in his comment time.

76. Ms. Cousins then immediately called out Mr. Asher for having used her name.

<u>**COUNT I – The No Trespass Order Was an Impermissible Restriction**</u>
<u>**on Speech in a Public Forum**</u>
**Violation of the First Amendment to the U.S. Constitution Against Both Defendants**
**(42 U.S.C. § 1983)**

77. Mr. Monroe repeats the allegations set forth above as if fully set forth herein.

78. The First Amendment to the U.S. Constitution prohibits the abridgment and chilling of free speech.

79. The First Amendment is applicable to the states through the Fourteenth Amendment.

80. Speech critical of the government and its officials, including Mr. Monroe's speech at Board meetings criticizing the Board, the District, and District employees, is protected speech under the First Amendment.

81. Persons violating the First Amendment under color of state law are liable at law and in equity under 42 U.S.C. § 1983.

82. The public comment period of the open public meetings of the Board of Education constitutes at least a limited public forum.

83. Because the public comment period of the open public meetings of the Board of Education are, at the least, limited public forums, Defendants cannot unreasonably exclude individuals from those meetings, nor may they exclude individuals based on viewpoint.

84. Mr. Monroe engaged in constitutionally protected speech when he attended open public meetings of the Board of Education to voice his opinions and disagreement with Defendants' policies and actions.

85. Mr. Monroe was prohibited from engaging in constitutionally protected First Amendment activity as a result of the no trespass order, because the no trespass order prevented him from attending and speaking at open public meetings of the Board of Education.

86. Defendants violated Mr. Monroe's free-speech rights under the First Amendment by banning him from open public meetings of the Board of Education from October 22, 2024, to April 22, 2025, because the no trespass order unlawfully restrained Mr. Monroe's speech and participation in a public forum on matters of public interest and concern.

87. Restrictions on speech in limited public forums must be both reasonable in light of the forum's purpose and viewpoint neutral. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

88. Mr. Monroe's ban was unreasonable in light of the purpose of the public comment period of the Board's meetings, which is to provide community members the opportunity to express their views on subjects related to the District's management.

89. The October 22, 2024 letter banning Mr. Monroe for six months demonstrates that the no trespass order is both unreasonable and viewpoint discriminatory.

90. To the extent the no trespass order was based on alleged "disruptive behavior" and alleged "persistent and repeated violations of the Board's public comment rules"—which appears to amount to using names of government official and employees, allegedly exceeding his allotted time, and making contact with Mr. Jackson's arm as Mr. Jackson suddenly reached across him seconds after his time expired—it is a disproportionate response to Mr. Monroe's conduct during

public comment and, therefore, unreasonable. *See Vollmecke v. Indep. Sch. Dist.*, 2024 WL 4524547, at *3-6 (W.D. Mo. Oct. 11, 2024) (holding that even if plaintiff's conduct delayed closing the meeting, a prohibition from "all District property for one year is not proportional to, and thus not justified by, Plaintiff's conduct").

91. Courts have routinely rejected categorical bans based on alleged behavior far more serious than the incident and time violations described in the letter banning Mr. Monroe. *See Coffelt v. Omaha Sch. Dist.*, 309 F. Supp. 3d 629, 632 (W.D. Ark. 2018) (enjoining ban against plaintiff attending events on school property open to the public after ban was based on heated argument where plaintiff cursed at the superintendent, calling him "chicken shit"); *Wilson v. N.E. Ind. Sch. Dist.*, 2015 WL 13716013, at *1 (W.D. Tex. Sept. 30, 2015) (finding that the plaintiff's ban was a categorical restriction they after grabbed the fingers of a school official and called him a "liar" during a hostile conversation, and as a result was completely banned from school board facilities).

92. The ban is unreasonable because Mr. Monroe has not actually disrupted any Board meetings, nor posed any danger or threat to any District employees or Board members. What appears to be brief contact between papers in Mr. Monroe's hand and Mr. Jackson's arm as Mr. Jackson reached across him did not create any disruption to the meeting nor pose a danger to Mr. Jackson.

93. Mr. Monroe's ban from Board meetings was also viewpoint discriminatory because the District and Board's characterization of Mr. Monroe's "persistent and repeated violations of the Board's public comment rules" and "disruptive behavior" is largely based on criticism of Board members and disfavored viewpoints Mr. Monroe has expressed in his public comments.

94. The ban is also viewpoint discriminatory as it is based at least in part on the discriminatory application of the Board policies to punish speakers who criticize Board members and District employees by name but permit the use of such names when speakers are complimentary.

95. Due to the six-month no trespass order, Mr. Monroe was forced to alter his constitutionally protected activities, including participating in the public comment period of Board meetings, to avoid further adverse actions from the District.

96. Mr. Monroe intends to continue to speak at Board meetings in a passionate manner since the ban has been lifted and to criticize the Board and District when he believes such criticism is merited.

97. The unconstitutional no trespass order was issued by the District and Board pursuant to the Board's final policymaking authority over District property.

98. Mr. Monroe is entitled to nominal damages for the violation of his First Amendment rights.

**COUNT II – The No Trespass Order Violated Due Process by Depriving Mr. Monroe of His Liberty Interest in Participating in Public Forums on District Property Without an Opportunity to Be Heard**
**Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Against Both Defendants**
**(42 U.S.C. § 1983)**

99. Mr. Monroe repeats the allegations set forth above as if fully set forth herein.

100.     Government entities and officials, including the District and Board, cannot deprive an individual of a property or liberty interest without due process of law.

101.     Under the Due Process Clause, procedural due process requires both notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

102.     Mr. Monroe has a strong First Amendment liberty interest in access to the public comment period of open public meetings of the Board of Education, which are at least limited public forums.

17

103.     The no trespass order did not set out a process for contesting Mr. Monroe's ban, and Mr. Monroe did not have any opportunity to contest the ban.

104.     Any interest Defendants had in instituting and enforcing the no trespass order did not justify depriving Mr. Monroe of an opportunity to be heard or challenge the ban.

105.     The no trespass order was issued by the District and Board pursuant to their unconstitutional policy of banning individuals from public forums on school property without providing for a right to appeal the ban. The Board and District directed the issuance of the no trespass order and had final policymaking authority to issue the unconstitutional no trespass order against Mr. Monroe.

106.     Because the District and Board's policy and issuance of the no trespass order deprived Mr. Monroe of any opportunity to be heard in connection with his ban from public forums on District property, the no trespass order did not afford sufficient process prior to the deprivation of Mr. Monroe's liberty interest in participating in public forums on District property, including open public meetings of the Board.

107.     Mr. Monroe is entitled to nominal damages for the violation of his rights under the Due Process Clause.

108.     Mr. Monroe wishes to speak at Board meetings and to speak about Defendants and their policies.

109.     Mr. Monroe's right to free expression is objectively chilled by the Board's policy of banning individuals from public forums on school property without an opportunity to be heard.

110.     Declaratory and injunctive relief is required to protect Mr. Monroe's rights under the Due Process Clause and prevent future enforcement of the District and Board's unconstitutional policy.

**COUNT III – The Prohibition on Using Individuals' Names Is an Unreasonable
Restriction on Speech in a Limited Public Forum and Has Been Applied in
a Viewpoint-Discriminatory Manner**
**Violation of the First Amendment to the U.S. Constitution Against Both Defendants**
**(42 U.S.C. § 1983)**

111.     Mr. Monroe repeats the allegations set forth above as if fully set forth herein.

112.     Because the public comment period of the open public meetings of the Board of Education are, at the least, limited public forums, restrictions on the public comment period must viewpoint neutral and be reasonable in light of the purpose of the forum, which is to provide community members the opportunity to express their views on subjects related to the District's management.

113.     Given the stated purpose of the forum, Defendants' prohibition against the use of individuals' names during public comments is unreasonable because, to the extent it bars the use of the names of Board Members and District employees, it limits community members' "opportunity to express all [their] respective views" on subjects related to the District's management by preventing them from using the names, titles, or locations of elected Board members and District employees who are responsible for the District's management.

114.     Despite speech about public officials being at the core of First Amendment protection, Defendants prohibit the use of elected Board members' names and employees' names regardless of the purpose.

115.     The names of District administration, employees, and elected officials are public information under the Missouri Sunshine Law.

116.     Not only are these policies unreasonable in their blanket prohibitions against identifying Board members and District employees by name or title, they have been enforced in a viewpoint-discriminatory manner.

19

117.      As alleged in Paragraphs 58 to 76 above, while the Board's rules prohibit all uses of names, in practice the Board discriminatorily applies this rule to speakers like Mr. Monroe who use Board members' or District employees' names in comments that are critical of the Board or District. The Board permits the use of names when speakers' remarks are neutral or complimentary.

118.      Mr. Monroe would like to use certain individuals' names, including the names of Board members and District employees, when necessary to comment on issues relating to the District. However, Mr. Monroe engages in self-censorship by not using individuals' names where he otherwise would because he reasonably fears, based on Defendants' policies, communications to him, and issuance of the no trespass order, that the use of individual names in violation of Defendants' policies would result in the denial of his ability to speak at or attend public Board meetings.

119.      Mr. Monroe is under a credible threat that he may be restricted from attending or speaking at Board meetings if he uses individuals' names.

120.      Mr. Monroe's speech has been and continues to be chilled by Defendants' unconstitutional prohibition on the Board members' and District employees' names and titles.

121.      Mr. Monroe is also injured by the viewpoint-discriminatory enforcement of the policy, as he must censor his comments while those who are complimentary of District employees or Board members need not do so.

122.      Mr. Monroe is entitled to nominal damages for the violation of his rights under the First Amendment.

123.      Declaratory and injunctive relief preventing future enforcement of the "no names" policy and its discriminatory application is required to protect Mr. Monroe's First Amendment rights.

**COUNT IV – The Prohibitions on Disrespectful Language and "Speaking Derogatorily About Anyone" Are Unconstitutional Viewpoint-Based Restrictions on Speech in a Limited Public Forum**
**Violation of the First Amendment to the U.S. Constitution Against Both Defendants**
**(42 U.S.C. § 1983)**

124.    Mr. Monroe repeats all the allegations set forth above as if fully set forth herein.

125.    The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Speech may not be censored because it is critical of government officials, employees, or policies, even if such criticisms are expressed in ways that are unpleasant or offensive.

126.    Restrictions on speech in limited public forums must be both reasonable in light of the forum's purpose and viewpoint neutral. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

127.    The Board's public comment rules requiring that speakers remain "respectful" and refrain from "speaking derogatorily about anyone" are viewpoint-discriminatory restrictions on speech and are unconstitutional on their face.

128.    Defendants, in their March 18, 2024 letter, warned Mr. Monroe that future violations of the Board's rules for public comment periods could result in prohibitions on Mr. Monroe's ability to attend Board meetings.

129.    Mr. Monroe reasonably fears that Defendants will enforce these policies prohibiting disrespectful or derogatory language against him to prevent him from engaging in sharp criticism of the Board and District, and to prevent him from engaging in any criticism at all of specific

individuals who hold elected office, leadership positions, or other positions within the Board or District when he speaks during the public comment period.

130.    Mr. Monroe intends to continue to speak at Board meetings and to speak about Defendants and their policies. However, his right to free expression is objectively chilled by the existence of the Board requirement that speakers remain "respectful" and refrain from "speaking derogatorily about anyone," which could be enforced to ban Mr. Monroe in the future.

131.    Declaratory and injunctive relief preventing enforcement of the requirement that speakers remain "respectful" and refrain from "speaking derogatorily about anyone" is required to protect Mr. Monroe's rights under the First Amendment.

**COUNT V – The Requirement That Speakers Remain "Respectful"**
**Is Unconstitutionally Vague**
**Violation of the Due Process Clause of the Fourteenth Amendment to the U.S.**
**Constitution Against Both Defendants**
**(42 U.S.C. § 1983)**

132.    Mr. Monroe repeats all the allegations set forth above as if fully set forth herein.

133.    A government policy is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment if it fails to provide the kind of notice that will enable a person of ordinary intelligence a reasonable opportunity to know what is prohibited.

134.    The public comment rules on the Board's agendas require that commenters remain "respectful."

135.    Defendants do not have any other policies or documents relating to or reflecting what constitutes "respectful" speech or behavior.

136.    The requirement that speakers remain "respectful" is unconstitutionally vague because it fails to provide a person of ordinary intelligence a reasonable opportunity to know what

speech or conduct is prohibited and to act accordingly, and because it allows for arbitrary and discriminatory enforcement.

137.    Based on the past actions of the Defendants, including warning him that violations of the rules for public comment periods could results in restrictions on his ability to attend and speak at public Board meetings, Mr. Monroe reasonably fears that Defendants will enforce the respectfulness requirement against him in the future to deny him the ability to speak during public comment periods at Board meetings or to deprive him of access to Board meetings. Because the requirement is unconstitutionally vague, Mr. Monroe cannot understand what actions may subject him to its enforcement.

138.    Declaratory and injunctive relief preventing enforcement of the respectfulness policy is required to protect Mr. Monroe's rights under the Due Process Clause.

## **PRAYER FOR RELIEF**

139.    WHEREFORE, in light of the foregoing, William Monroe respectfully requests this Court:

a.   Enter judgment in Mr. Monroe's favor on Counts I-V and award nominal damages on Counts I-III;

b.   Enter a judgment on Count II declaring that Defendants' unconstitutional policy of banning individuals from open, public Board meetings without providing them with an opportunity to contest the ban violates due process and enjoining Defendants from enforcing such policy;

c.   Enter a judgment on Count III declaring that Defendants' prohibitions on using the names, titles, or locations of employees and on using the names of Board members: (1) are an unreasonable restriction on speech in a limited public forum

in violation of the First Amendment and (2) are enforced in a viewpoint-discriminatory manner in violation of the First Amendment, and enjoining Defendants from enforcing the prohibitions and/or enjoining Defendants from enforcing the prohibitions in a viewpoint discriminatory manner;

d. Enter a judgment on Count IV declaring that Defendants' prohibitions on disrespectful language and derogatory speech are unconstitutional viewpoint-discriminatory restrictions on speech in violation of the First Amendment and enjoining Defendants from enforcing such prohibitions;

e. Enter a judgment on Count V declaring Defendants' requirement that public commenters remain "respectful" is unconstitutionally vague and enjoining Defendants from enforcing such requirement;

f. Award Plaintiff costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

g. Grant such other relief as the Court deems just and proper.

Dated: April 25, 2025                     Respectfully submitted,

                                          /s/ Lisa S. Hoppenjans
                                          Lisa S. Hoppenjans, #63890 (MO)
                                          Benjamin J. Wilson, #63329 (MO)
                                          Jason Forse (motion for authorization of law student
                                             practice pending)
                                          Sophia Goettke (motion for authorization of law
                                             student practice pending)
                                          Haleigh Hoskins (motion for authorization of law
                                             student practice pending)
                                          First Amendment Clinic
                                          Washington University in St. Louis School of Law
                                          MSC 1120-250-102
                                          One Brookings Drive
                                          St. Louis, MO 63130
                                          Phone: (314) 935-8980
                                          lhoppenjans@wustl.edu
                                          benwilson@wustl.edu

                                          **ATTORNEYS FOR PLAINTIFF**